UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SCALLOP IMAGING, LLC, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * Civil Action No. 17-cv-10092-ADB |
| BLACKHAWK IMAGING, LLC, and | * |
| VISION TECHNOLOGIES, INC., | * |
| | * |
| Defendants. | * |

## **MEMORANDUM AND ORDER ON MOTION TO DISMISS**

BURROUGHS, D.J.

      In March 2015, Defendant Vision Technologies, Inc. ("Vision") agreed to acquire Plaintiff Scallop Imaging, LLC's ("Scallop") camera technology, but formed a subsidiary, Defendant Blackhawk Imaging, LLC ("Blackhawk"), which ultimately purchased the assets from Scallop. Blackhawk has since defaulted on numerous payments due under the purchase agreement as well as several follow-on agreements between Scallop and Blackhawk. Scallop asserts claims for breach of contract, unjust enrichment, and misrepresentation against Blackhawk and seeks to pierce the corporate veil to hold Vision liable for Blackhawk's acts and omissions. [ECF No. 28] ("Amended Complaint"). Blackhawk answered the Amended Complaint and admitted many of the allegations concerning its missed payments. [ECF No. 34] ("Answer"). Currently pending before the Court is Vision's motion to dismiss for lack of personal jurisdiction, or, alternatively, for failure to state a claim. [ECF No. 35]. For the reasons stated herein, the motion to dismiss is <u>DENIED</u>.

**I.    BACKGROUND**

      Because Vision moves to dismiss for lack of personal jurisdiction, the following factual

1

summary draws from "the pleadings and whatever supplemental filings (such as affidavits) are contained in the record," giving credence to Scallop's version of the genuinely contested facts, as well as from the undisputed facts proffered by Vision. Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc., 825 F.3d 28, 34 (1st Cir. 2016).

Vision (a Delaware corporation with its principal place of business in Arkansas) and Scallop (a Massachusetts limited liability company with its principal place of business in Massachusetts) both develop and/or distribute camera systems. Am. Compl. ¶¶ 7−9; [ECF Nos. 28-19]; [ECF No. 37 at ¶¶ 3, 5] ("Affidavit of Lee Thompson" or "Thompson Aff."). In July 2014, Vision President Lee Thompson contacted Scallop Manager Olaf Krohg, and they entered into an agreement whereby Vision became a distributor of Scallop's products. Am. Compl. ¶ 17; Thompson Aff. ¶ 5. In March 2015, after Scallop initiated a discussion with Vision, Vision and Scallop signed a letter of intent memorializing a proposal for Vision to acquire substantially all of Scallop's assets. Thompson Aff. ¶ 5. Vision then formed a wholly-owned subsidiary, Blackhawk (a Delaware limited liability company with its principal place of business in Arkansas), for the purpose of entering into the transaction with Scallop. Id. ¶ 6; Am. Compl. ¶¶ 8, 18. Following the formation of Blackhawk, (1) Vision's Vice President, Chuck Thompson, concurrently served as Blackhawk's President and Chief Operating Officer; (2) Harvey Weiss, who resigned from Vision's board of directors when Blackhawk was formed, served as Blackhawk's Chief Executive Officer; and (3) Vision accountant John Uitz concurrently served as Blackhawk's Chief Financial Officer. Thompson Aff. ¶¶ 6−9. Vision President Lee Thompson is also the father of Chuck Thompson. Id. ¶ 4.

On April 21, 2015, Blackhawk and Scallop entered into an Asset Purchase Agreement. Am. Compl. ¶ 18. In exchange for acquiring substantially all of Scallop's assets, Blackhawk

executed two promissory notes representing a $700,000 loan made from Scallop to Blackhawk. Id. The notes required Blackhawk to pay Scallop $100,000 on May 31, 2015 and $600,000 on June 30, 2015. Id. Blackhawk also agreed under a separate note to pay Scallop an earnout amount of $125,000. Id.; [ECF No. 32 at ¶ 3] ("Krohg Aff."). As collateral for the loan, Blackhawk granted Scallop a security interest in its assets and licensed to Scallop, on a royalty-free basis, the intellectual property that Blackhawk acquired under the Asset Purchase Agreement. Am. Compl. ¶ 18; Krohg Aff. ¶ 3.

Blackhawk defaulted on the payments due on May 31 and June 30, and never paid any of the amounts owed to Scallop under those notes. Krohg Aff. ¶¶ 4−5. Less than one month after Blackhawk failed to meet these payment obligations, Vision transferred 75% of its equity in Blackhawk "to people affiliated with the company" as follows:

> 10% to Lee Thompson, President of Vision;
> 25% to Chuck Thompson, Vice President of Vision and President and COO of Blackhawk;
> 25% to Harvey Weiss, CEO of Blackhawk and former director of Vision;
> 5% to John Uitz, accountant at Vision and CFO of Blackhawk;
> 5% to William Bowen, Engineering Vice President at Vision; and
> 5% to Ki Pho Hong.

Thompson Aff. ¶ 11. Vision nonetheless continued to claim on its website that Blackhawk was a wholly-owned subsidiary. Id.; Am. Compl. ¶ 55. Blackhawk also shared Vision's office from its formation in March 2015 until moving to a separate office in Arkansas in September 2016. Thompson Aff. ¶ 13.

On October 26, 2015, Blackhawk and Scallop entered into a Forbearance Agreement, wherein Blackhawk acknowledged that it had defaulted under the Asset Purchase Agreement and was then required to pay the original $700,000, the $125,000 earnout, and an additional $10,000 to cover Scallop's reasonable costs and expenses. Am. Compl. ¶ 20; Krohg Aff. ¶¶ 7−10. In exchange, Scallop agreed to forbear from filing a lawsuit against Blackhawk or exercising its

available remedies under the Asset Purchase Agreement. Am. Compl. ¶ 20; [ECF No. 28-1]. Over the next year, Blackhawk failed to make the required payments under the Forbearance Agreement. Am. Compl. ¶ 23; Answer ¶ 3; Krohg Aff. ¶¶ 10−14.

In another attempt to facilitate the satisfaction of the debt, on October 20, 2016, Blackhawk and Scallop entered into a Settlement Agreement, pursuant to which Blackhawk promised to repay the debt in monthly installments of $88,000 to commence on November 15, 2016, $27,500 for interest, costs, expenses, and attorney's fees, $1,320 as a late payment fee, and 0.05% daily interest on the outstanding principal of any late payments. Am. Compl. ¶ 24; Krohg Aff. ¶¶ 15. Upon executing the Settlement Agreement, Blackhawk paid $12,500 to extend Scallop's forbearance from filing a lawsuit, and paid $15,000 to be applied to unpaid interest. Am. Compl. ¶ 27; Krohg Aff. ¶ 18. After Blackhawk missed the first payment due on November 15, 2016, Vision's President advised Scallop that he would contact Chuck Thompson and Weiss. Am. Compl. ¶ 27; [ECF No. 28-14]. On December 21, 2016, Weiss stated the following in an email to Krohg and Scallop's lender, Silver Oaks Lending LLC:

> Your patience with Vision and Blackhawk [is] appreciated and will increase the probability of full and complete payment. Collectively, [Blackhawk] and [Vision] are about to emerge from a large and protracted business development effort that will begin producing [revenue on January 5th] . . . . That means there is sufficient gross profit to pay our debt and all of the interest. The Companies [Vision and Blackhawk] know they are late and they have a high degree of confidence of success which is why they paid the first [$27,000] when we did . . . .

[ECF No. 28-15]. To date, Blackhawk has failed to make any other payments due under the Settlement Agreement and, accordingly, owes Scallop $615,050, plus 18% interest per annum, late fee charges of $2,640, and interest on the additional outstanding principal balance of $15,991.30. Am. Compl. ¶ 29; Krohg Aff. ¶¶ 20−21.

## II. DISCUSSION

Scallop contends that this Court may exercise personal jurisdiction over Vision, and ultimately hold Vision liable for the damages caused by Blackhawk, by piercing the corporate veil. Although the questions of jurisdiction and liability are ordinarily independent of one another, "the factors that [the Court] must consider for purposes of piercing the veil separating two corporations in the liability context also inform the jurisdictional inquiry." Negron-Torres v. Verizon Comm's, Inc., 478 F.3d 19, 26 (1st Cir. 2007) (quoting United Elec. Workers v. 163 Pleasant St. Corp., 960 F.2d 1080, 1091 (1st Cir. 1992)). Given that Vision essentially raises the same arguments with respect to jurisdiction and liability, and Blackhawk has conceded that it defaulted under the underlying agreements, Scallop may plausibly state a claim against Vision at this stage if it prevails on the jurisdictional question, although establishing jurisdiction by no means suggests that "success on the merits is inevitable." AngioDynamics, Inc. v. Biolitec, Inc., No. 09−30181, 2011 WL 3157312, at *6, 8 (D. Mass. July 25, 2011), aff'd, 780 F.3d 429 (1st Cir. 2015).

Scallop bears the burden of establishing that personal jurisdiction over Vision lies in Massachusetts. Baskin-Robbins, 825 F.3d at 34. "Faced with a motion to dismiss for lack of personal jurisdiction, a district court 'may choose from among several methods for determining whether the plaintiff has met [its] burden.'" Adelson v. Hananel, 510 F.3d 43, 48 (1st Cir. 2007) (quoting Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 50–51 (1st Cir. 2002)). Scallop and Vision agree that the Court should apply the prima facie standard, which governs when "a district court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing." United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 618 (1st Cir. 2001); see [ECF Nos. 35, 38]. The prima facie standard does not involve

5

differential fact finding; rather, it requires "only that a plaintiff proffer evidence which, taken at face value, suffices to show all facts essential to personal jurisdiction." Baskin-Robbins, 825 F.3d at 34. The Court accepts "plaintiff's properly documented evidentiary proffers as true . . . and construe[s] them in the light most congenial to the plaintiff's jurisdictional claim." Daynard, 290 F.3d at 51. "If the plaintiff makes a prima facie showing of jurisdiction supported by specific facts alleged in the pleadings, affidavits, and exhibits, its burden is met." Ealing Corp. v. Harrods Ltd., 790 F.2d 978, 979 (1st Cir. 1987).

There are two types of personal jurisdiction: general and specific. Harlow v. Children's Hosp., 432 F.3d 50, 57 (1st Cir. 2005). General jurisdiction exists "when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state." United Elec. Workers, 960 F.2d at 1088. In contrast, specific jurisdiction exists when "the cause of action arises directly out of, or relates to, the defendant's forum-based contacts." Pritzker v. Yari, 42 F.3d 53, 60 (1st Cir. 1994) (quoting United Elec. Workers, 960 F.2d at 1088−89).

A.    **General Jurisdiction**

To exercise general jurisdiction over a corporate defendant, the Court must find its contacts "so 'continuous and systematic' as to render [it] essentially at home" in the forum State. Daimler AG v. Bauman, 134 S. Ct. 746, 758 n.11 (2014) (quoting Goodyear Dunlop Tires Operations v. Brown, 564 U.S. 915 (2011)); see also Kipp v. Ski Enter. Corp. of Wis., 783 F.3d 695, 698 (7th Cir. 2015) ("In recent years, the Supreme Court has clarified and, it is fair to say, raised the bar for [general] jurisdiction."). The place of incorporation and principal place of business are "paradigm bases for general jurisdiction." Daimler, 134 S. Ct. at 757, 760. Although there may be an "exceptional case" where general jurisdiction is appropriate in a state other than

the state of incorporation or where the principal place of business is located, the Supreme Court has not explained what circumstances would give rise to such an exceptional case. See Medici v. Lifespan Corp., 239 F. Supp. 3d 355, 368 (D. Mass. 2017); Daimler, 134 S. Ct. at 761 n.19 ("A corporation that operates in many places can scarcely be deemed at home in all of them.").

Scallop does not contend that there is any basis for exercising general jurisdiction over Blackhawk or Vision, and the record is devoid of any evidence that Vision or Blackhawk engaged in continuous and systematic activity sufficient to find that either of them is "essentially at home" in Massachusetts. Neither Vision nor Blackhawk is incorporated in Massachusetts or has its principal place of business in Massachusetts. See Am. Compl. ¶¶ 8–9; Thompson Aff. ¶¶ 2, 6, 13. At most, one Vision employee works remotely from Massachusetts, but Vision has never maintained an office in Massachusetts. Thompson Aff. ¶ 2. In the absence of any evidence of Vision or Blackhawk having continuous and systematic contact with Massachusetts, the Court does not have general jurisdiction over Vision.

B. **Specific Jurisdiction**

The exercise of specific jurisdiction "hinges on satisfaction of two requirements: first, that the forum [state] has a long-arm statute that purports to grant jurisdiction over the defendant; and second, that the exercise of jurisdiction pursuant to that statute comports with the strictures of the Constitution." Pritzker, 42 F.3d at 60. Because the First Circuit has generally treated "the limits of Massachusetts' long-arm statute as coextensive with those of the Due Process Clause," Copia Commc'ns, LLC v. AMResorts, L.P., 812 F.3d 1, 4 (1st Cir. 2016), the Court may "sidestep the statutory inquiry and proceed directly to the constitutional analysis." Evans Cabinet

Corp. v. Kitchen Int'l, Inc., 593 F.3d 135, 146 (1st Cir. 2010); see Phillips v. Prairie Eye Ctr., 530 F.3d 22, 26 (1st Cir. 2008).[1]

To determine whether it may exercise specific jurisdiction, the Court conducts a three-part inquiry:

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's court foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

Pritzker, 42 F.3d at 60−61 (quoting United Elec. Workers, 960 F.2d at 1089).

1. Blackhawk

As an initial matter, Blackhawk consented to this Court's jurisdiction pursuant to the forum selection clause in the Forbearance Agreement and in the Settlement Agreement. "A party to a contract may waive its right to challenge personal jurisdiction by consenting to personal jurisdiction in a forum selection clause." Inso Corp. v. Dekotek Handelsges, 999 F. Supp. 165, 166 (D. Mass. 1998) (citing M/S Bremen v. Zapata Off–Shore Co., 407 U.S. 1, 11 (1972)). The Forbearance Agreement and Settlement Agreement provide that Blackhawk "irrevocably and unconditionally consents to the exclusive jurisdiction" of the federal and state courts in Massachusetts for the purpose of any litigation relating to or arising out of the relevant

---

[1] Although the Massachusetts long-arm statute "might impose more restrictive limits on the exercise of personal jurisdiction than does the Constitution," Copia Commc'ns, LLC v. AMResorts, L.P., 812 F.3d 1, 4 (1st Cir. 2016), neither party has raised this issue here. See [ECF Nos. 35, 38]. The Court will therefore proceed with the constitutional analysis. See, e.g., Katz v. Spiniello Cos., 244 F. Supp. 3d 237, 244 (D. Mass. 2017); see also Bohnenberger v. MCBC Hydra Boats, LLC, No. 16–11368, 2017 WL 3976566, at *4 n.8 (D. Mass. 2017) (collecting similar cases).

agreements between Scallop and Blackhawk. [ECF Nos. 28-1 at 11, 28-11 at 13−14]. Blackhawk also admitted in its Answer that this Court had personal jurisdiction over it. Answer ¶ 14.

In addition to its admission and consent to jurisdiction, Blackhawk has other contacts with Massachusetts that directly relate to this action. "In contract cases, a court charged with determining the existence vel non of personal jurisdiction must look to the elements of the cause of action and ask whether the defendant's contacts with the forum were instrumental either in the formation of the contract or in its breach." Phillips Exeter Acad. v. Howard Phillips Fund, 196 F.3d 284, 289 (1st Cir. 1999). After entering into the Asset Purchase Agreement, Blackhawk defaulted on payments due to Scallop, a Massachusetts limited liability company with its principal place of business in Massachusetts. It then negotiated with Scallop for the Forbearance Agreement to facilitate its repayment of the debts owed in exchange for Scallop agreeing not to file a lawsuit in Massachusetts. Blackhawk breached the Forbearance Agreement, and to secure Scallop's continued forbearance from filing a lawsuit in Massachusetts, negotiated for the Settlement Agreement, which Blackhawk also breached by failing to make the required payments. The Court therefore has personal jurisdiction over Blackhawk based on its admission that this Court has jurisdiction, and its conduct concerning the formation and breach of agreements that named Massachusetts as the exclusive forum.

  2. <u>Vision</u>

Given that the Court plainly has jurisdiction over Blackhawk, Scallop seeks to impute Blackhawk's contacts with Massachusetts to Vision as its alter ego. "Since the essence of personal jurisdiction is to bring responsible parties before the court, a corporation which is actually responsible for its subsidiary's decision to undertake instate activities should, in all fairness, be within the state courts' jurisdictional reach." Donatelli v. Nat'l Hockey League, 893

F.2d 459, 466 (1st Cir. 1990). "[O]nce minimum contacts can be attributed derivatively to the parent, . . . all of the relevant secondary criteria (e.g., notice, foreseeability, reciprocity, purposeful availment, and the other Gestalt factors) corroborate the appropriateness of an exercise of jurisdiction." Id. "[I]n the context of a parent-subsidiary relationship, the theory for imputing contacts from one entity to another is a theory based on piercing the corporate veil." Katz v. Spiniello Cos., 244 F. Supp. 3d 237, 253 (D. Mass. 2017); see Harrelson v. Seung Heun Lee, 798 F. Supp. 2d 310, 316 (D. Mass. 2011) (applying veil piercing principles to alter ego theory of personal jurisdiction).

Because the underlying claims here are based in state law, state law principles guide the analysis. See Katz, 244 F. Supp. 3d at 252; In re Lernout & Hauspie Sec. Lit., 337 F. Supp. 2d 298, 321 (D. Mass. 2004). The veil piercing standard in Massachusetts is "demanding," as corporations are presumed to be "separate and distinct entities notwithstanding [the] relationships between them." Scott v. NG U.S. 1, Inc., 881 N.E.2d 1125, 1131 (Mass. 2008). Although the corporate veil "may be pierced only with reluctance and in extreme circumstances when compelled by reasons of equity," the Massachusetts Supreme Judicial Court has identified two scenarios in which the corporate form may be disregarded. Lothrop v. North Am. Air Charter, Inc., 95 F. Supp. 3d 90, 100 (D. Mass. 2015). "The first is when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the inter-corporate relationship." Id. (quoting My Bread Baking Co. v. Cumberland Farms, Inc., 233 N.E.2d 748, 752 (Mass. 1968)). "The second is when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity

10

about the manner and capacity in which the various corporations and their respective representatives are acting." Id. (quoting My Bread, 233 N.E.2d at 752). To determine whether to pierce the corporate veil, courts holistically consider the following twelve factors:

> (1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation's funds by dominant shareholder; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud.

Id. at 101 (quoting Att'y. Gen. v. M.C.K., Inc., 736 N.E.2d 373, 380 n.19 (Mass. 2000)).

Here, at least at the motion to dismiss stage, Scallop has set forth a sufficient basis for exercising jurisdiction over Vision. The record shows that Vision and Scallop had an established distribution relationship when they signed a letter of intent for Vision to purchase Scallop's assets, but that Vision formed Blackhawk, a wholly-owned subsidiary, for the specific purpose of entering into the Asset Purchase Agreement. Blackhawk immediately defaulted on its payments in May and June 2015. Shortly thereafter, Vision transferred 75% of its ownership interest to various Vision and/or Blackhawk employees, although Vision's website continued to advertise Blackhawk as a wholly-owned subsidiary. Vision and two of its officers, Lee Thompson and Chuck Thompson, together maintained a majority of the equity interest in Blackhawk. There is also substantial overlap amongst the owners and officers of Blackhawk and Vision: Lee Thompson is a 10% owner of Blackhawk and President of Vision; Chuck Thompson is a 25% owner and President/COO of Blackhawk and Vice President of Vision; Harvey Weiss is a 25% owner and CEO of Blackhawk and former director of Vision; John Uitz is a 5% owner and CFO of Blackhawk and an accountant Vision; and William Bowen is a 5% owner of Blackhawk and Engineering Vice President at Vision. Blackhawk also shared Vision's office from its formation

in March 2015 until September 2016. Further, both defendants sold some of the same products, which employ the technology acquired from Scallop. [ECF Nos. 38-1, 38-4]; cf. Cabot Safety Intermediate Corp. v. Arkon Safety Equip., Inc., 12 F. Supp. 2d 180, 182 (D. Mass. 1998) (parent exercised pervasive control over subsidiary where there was exact overlap of key officers and both parent and subsidiary sold same general type of equipment).

Beyond the commonality of corporate officers or ownership interests, which could be characteristic of an ordinary parent and subsidiary relationship, the record sufficiently shows, at least at this stage, that Vision used Blackhawk to promote fraud. Fraudulent behavior includes "maintain[ing] the subsidiary to avoid a statutory responsibility, act[ing] in a blameworthy manner, loot[ing] the subsidiary, or so undercapitalizing the subsidiary that the latter could not reasonably have been expected to meet its obligations." United Elec. Workers, 960 F.3d at 1093. Here, Vision signed the letter of intent with Scallop to acquire its assets, specifically formed Blackhawk to execute the transaction, but then left Blackhawk so vastly undercapitalized that it has failed to pay $615,050 of the $825,000 owed, excluding interest. Cf. Birbara v. Locke, 99 F.3d 1233, 1241 (1st Cir. 1996) (holding that veil piercing was not justified where it was "not a case involving a close corporation where the parent 'form[s] a subsidiary with minimal capitalization for the purpose of engaging in risky activities' and where absolute limited liability would create 'incentives to engage in a socially excessive amount of risky activities'" (citing Frank H. Easterbrook & Daniel R. Fischel, THE ECONOMIC STRUCTURE OF CORPORATE LAW 57 (1991))); Giuliano v. Nations Title, Inc., 938 F. Supp. 78, 82 (D. Mass. 1996) ("Where the subsidiary is not a self-contained business operation, it may not have funds to cover the liabilities that are associated with the total endeavor of which it is a part. A corporate entity could then escape liability by limiting its presence in a state (or in the country) to undercapitalized

'subsidiaries' provided with only minimum funds for their short-term operations"). Blackhawk not only defaulted on payments due under the Asset Purchase Agreement, but over the course of years, proceeded to negotiate for, and ultimately breach, at least two additional agreements intended to satisfy the original debt owed on the assets that Vision formed Blackhawk to purchase. Blackhawk's December 2016 email to Scallop, stating that "[Blackhawk and Vision] know they are late" on payments but that they had a "high degree of confidence" in meeting future obligations, is additional evidence that Vision and Blackhawk presented themselves as jointly responsible for the amounts due.

Taking the allegations and the evidence in the light most favorable to the non-moving party, Vision brokered an asset acquisition deal with Scallop, then formed a wholly-owned subsidiary to execute the purchase agreement, without any intention of properly funding it, and ultimately reaped the benefits of Scallop's technology while its subsidiary continually delayed payment or legal consequences by representing to Scallop that it would satisfy the debt and pay additional amounts if Scallop agreed to not file a lawsuit. Scallop has therefore met its burden to establish jurisdiction over Vision as the alter ego of Blackhawk.[2]

## III. CONCLUSION

For the foregoing reasons, Vision's motion to dismiss [ECF No. 35] is DENIED.

**SO ORDERED.**

March 22, 2018 /s/ Allison D. Burroughs
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE

---

[2] Because the prima facie standard accepts the evidence proffered at face value, Scallop retains the "ultimate burden of conclusively establishing contested jurisdictional facts," and Vision may "renew its jurisdictional objection at a later stage." Ortiz-Ildefonso v. SNC Technical Servs., LLC, No. 15−1197, 2016 WL 492767, at *3 & n.4 (D.P.R. Feb. 8, 2016) (applying prima facie standard of personal jurisdiction to alter ego theory). Moreover, Scallop's veil piercing theory survives the motion to dismiss for failure to state a claim on the same grounds that jurisdiction was deemed appropriate, but Vision may also renew its arguments on the merits at a later stage.