UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SCALLOP IMAGING, LLC, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 17-cv-10092-ADB |
| | * | |
| VISION TECHNOLOGIES, INC., | * | |
| | * | |
| Defendant. | * | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

BURROUGHS, D.J.

Plaintiff Scallop Imaging, LLC ("Scallop") brings this action against Defendant Vision Technologies, Inc. ("Vision"), alleging that Vision's subsidiary, the now-bankrupt Blackhawk Imaging LLC ("Blackhawk"),[1] breached multiple agreements with Scallop and that the corporate veil should be pierced to permit Scallop to recover from Vision. [ECF No. 28 ¶¶ 1–6, 54–62]. For the reasons set forth below, Scallop has failed to demonstrate that disregarding the corporate form is necessary to avoid injustice, and the Court will therefore enter judgment in Vision's favor.

**I.   PROCEDURAL HISTORY**

On January 20, 2017, Scallop sued both Vision and Blackhawk, alleging that Blackhawk breached its contracts with Scallop and that Vision, as Blackhawk's alter ego, should be held liable. [ECF No. 1]. After Scallop amended its complaint on March 13, 2017, [ECF No. 28], Blackhawk answered, [ECF No. 34], and Vision moved to dismiss based on a lack of personal

---

[1] Because of Blackhawk's bankruptcy, the parties stipulated to its dismissal from the case. [ECF No. 86].

1

jurisdiction, [ECF No. 35]. The Court denied Vision's motion on March 22, 2018. [ECF No. 52]. After unsuccessfully seeking reconsideration of that decision, see [ECF Nos. 53, 54], Vision answered, [ECF No. 55], and the parties began discovery, see [ECF No. 66]. Because Blackhawk filed for Chapter 7 bankruptcy in the United States Bankruptcy Court for the Western District of Arkansas, see [ECF No. 72 at 1], the Court stayed the case as to Blackhawk on February 21, 2019, [ECF No. 77]. Vision filed for summary judgment on April 22, 2019, [ECF No. 79], and Scallop opposed on May 13, 2019, [ECF No. 83]. Then, on September 25, 2020, at the parties' joint request, the Court dismissed Blackhawk from the case. [ECF Nos. 86, 87]. On December 14, 2020, the Court denied Vision's motion for summary judgment. [ECF No. 90].

The parties agreed to forgo a jury trial and try the case to the Court via Zoom. See [ECF No. 96]. Before trial, each party filed proposed findings of fact and conclusions of law, [ECF Nos. 101, 102], and Vision filed a trial brief on the corporate veil issue, [ECF No. 103]. During the two-day bench trial that began on July 12, 2021, the Court heard testimony from four witnesses, and roughly thirty exhibits were admitted into evidence. [ECF Nos. 100, 106, 108].

Having considered the evidence presented at trial and the parties' arguments, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## II.   FINDINGS OF FACT

### A.   The Parties and Key Players

Scallop was a Boston-based company that designed and sold security cameras.[2] In addition to its physical inventory, Scallop also owned a diverse portfolio of intellectual property,

---

[2] Scallop's cameras were capable of covering a large area by taking images from multiple sensors (i.e., lenses) and stitching them together, using a software program, to make a single image.

including patents, patent applications, and software. Olaf Krohg was Scallop's president and managing member.[3]

Vision is an Arkansas-based company that manufactures and sells cameras to the U.S. military. Vision's cameras typically meet military specifications (i.e., are "MIL-SPEC"), which means that they comply with the U.S. Department of Defense's requirements for military equipment.[4] Vision's cameras are sometimes characterized as "ruggedized," which generally means that they are waterproof and built to withstand rougher conditions than an ordinary camera. Although all MIL-SPEC cameras can be accurately described as ruggedized, not all ruggedized cameras are MIL-SPEC (because they do not necessarily comply with all of the Department of Defense's requirements).

Robert Lee Thompson, Sr. ("Thompson Sr.") has been Vision's President (and one of its shareholders) since he formed the company in 1998. Thompson Sr.'s son, Robert Lee Thompson, Jr. ("Thompson Jr."), has been a Vision Vice President since the company was formed and has been a shareholder since at least the beginning of 2015. Additional Vision personnel include William Bowen, a Vice President and shareholder; Harvey Weiss, a shareholder, advisor, and, at certain points, a director; and John Uitz, an accountant.

**B.     Early Business Relationship Between Scallop and Vision**

In the summer of 2014, Thompson Sr. reached out to Krohg to discuss the possibility of a business relationship between Vision and Scallop. In July 2014, to facilitate discussions, Vision

---

[3] Scallop is no longer operational, and Krohg is no longer affiliated with it.

[4] As one witness put it, a MIL-SPEC camera is designed to "survive on top of a tank running through the jungle or on a marine vehicle that is going on an expedition."

and Scallop executed a Mutual Confidentiality Agreement and Non-Disclosure Agreement and a non-binding Letter of Intent (the "First LOI"). The First LOI noted:

> The Parties' intent is to explore the technical feasibility and business prospects of Scallop providing its proprietary video camera technology products (the "Scallop Technology") as an Original Equipment Manufacturer [("OEM")] to [Vision]. [Vision] will endeavor to enhance the physical attributes of select Scallop proprietary video camera technology products so they meet or exceed MIL-STD or Operational Tests required to sell to [Vision]'s customers.

Because the parties were considering whether Vision could make Scallop's cameras into MIL-SPEC cameras, Scallop sent its cameras to Vision so that Vision could evaluate whether this was feasible.

In the course of exploring a potential OEM relationship, Krohg met with Thompson Sr. and Weiss on multiple occasions. Together, the three men visited Detroit, Michigan to meet with some of Vision's customers. Krohg, Thompson Sr., and Weiss got along well and shared an optimistic outlook for the Scallop-Vision relationship.

In early 2015, Scallop's owners began to consider selling the company or its assets and, instead of entering into an OEM relationship with Vision, shifted focus to a possible sale to Vision or another interested party. In March 2015, Scallop and Vision executed another non-binding Letter of Intent (the "Second LOI"), which contemplated Vision purchasing Scallop's assets.[5] In exchange for a $50,000 "standstill deposit" that Vision paid to Scallop, Scallop agreed not to discuss a sale with anyone other than Vision for a certain period of time. Although non-binding, the Second LOI included a relatively detailed term sheet, which contemplated a $750,000 total purchase price (consisting of two future payments totaling

---

[5] Krohg testified that Scallop pursued a deal with Vision, as opposed to another buyer, because a deal with Vision had the most upside and because he had developed a strong relationship with Thompson Sr. and Weiss.

$700,000 and the $50,000 standstill deposit). The Second LOI was negotiated primarily by Thompson Sr., Weiss, and Krohg. Following execution of the Second LOI, Vision began to conduct due diligence concerning Scallop.

### C. The Creation of Blackhawk, the Asset Purchase Agreement, and Changes to Blackhawk's Structure

On March 26, 2015, Blackhawk was formed as a wholly-owned subsidiary of Vision. Aside from paying the Delaware state LLC registration fee, Vision did not, at that time, capitalize Blackhawk. Blackhawk was specifically created to purchase Scallop's assets. Initially, (1) Thompson Sr. and Thompson Jr. were Blackhawk's only two directors, (2) Thompson Sr. was Blackhawk's CEO and President, and (3) Thompson Jr. was Blackhawk's COO.

Vision decided to use Blackhawk as an acquisition vehicle for multiple reasons. First, because Vision had determined that it could not incorporate Scallop's technology into MIL-SPEC cameras in a cost-effective manner,[6] it was decided that Vision would focus on selling its existing products in the military market and Blackhawk would focus on selling ruggedized versions of Scallop's cameras in the commercial (i.e., non-military) market. Second, Vision (and specifically, Thompson Sr.) were busy with other contracts and could not afford to shift attention elsewhere. Third, the relationship between Thompson Sr. and Thompson Jr. was strained, and they felt that it would be best to work separately, with Thompson Jr. spearheading the work at Blackhawk and Thompson Sr. remaining at Vision.

---

[6] After testing Scallop's technology when the parties were considering an OEM relationship, Vision concluded that Scallop's technology would not work in a military environment.

In April 2015, Scallop sold its assets to Blackhawk pursuant to an Asset Purchase Agreement ("APA") dated April 21, 2015. [7] Under the APA, Blackhawk agreed to purchase Scallop's assets for $750,000. Blackhawk did not pay the $750,000 upfront but rather issued Scallop two promissory notes: (1) a $100,000 promissory note due May 31, 2015 and (2) a $600,000 promissory note due June 30, 2015.[8] Further, the $50,000 standstill deposit, which Vision had already paid pursuant to the Second LOI, was credited against the purchase price. On top of those payments, over the two years following the execution of the APA, Blackhawk was obligated to make Scallop a series of "earnout payments," based on the revenue that Blackhawk derived from selling Scallop's products (or products utilizing Scallop's technology).[9]

Krohg signed the APA on behalf of Scallop as its managing member, and Thompson Jr. signed the APA on behalf of Blackhawk as its COO. Both parties were represented by counsel while negotiating the APA. Although Blackhawk made a series of representations and warranties, none of them concerned its financial condition, capitalization, or ability to pay back the notes. The APA contained the following language regarding amendment and integration:

> Any waiver, amendment, modification or supplement of or to any term or condition of this Agreement shall be effective only if in writing and signed by all parties hereto, and the parties hereto waive the right to amend the provisions of this Section orally. This Agreement, and the Schedules and exhibits hereto, constitute the entire contract between the parties hereto pertaining to the subject matter hereof, and supersede all prior and contemporaneous agreements and understandings between the parties with respect to such subject matter.

---

[7] It is unclear whether the APA was actually executed on April 21, 2015. The signatures themselves are not dated, and no witness could specifically recall the execution date.

[8] In essence, Blackhawk borrowed the money it used to purchase Scallop from Scallop.

[9] If the revenue-based earnout payments totaled less than $125,000, Blackhawk was required to pay Scallop the difference.

Vision was not a party to the APA, and the parties never executed a written amendment making Vision an obligor or guarantor under the APA.

At some point after the APA was executed, Blackhawk's ownership and management structure changed.[10]  Specifically, (1) Vision gave away 75% of its ownership interest in Blackhawk to a number of individuals,[11] (2) Weiss replaced Thompson Sr. on the board and as CEO, (3) Thompson Jr. became President, and (4) John Uitz was named CFO.

### D. The Forbearance and Settlement Agreements

Blackhawk did not pay back either promissory note on time.  After Blackhawk defaulted, Krohg, Thompson Sr., and Weiss negotiated and, eventually, Scallop and Blackhawk executed a Forbearance Agreement on October 26, 2015.[12]  The Forbearance Agreement consolidated the two outstanding notes (i.e., the $100,000 note originally due May 31, 2015 and the $600,000 note originally due June 30, 2015) into a new promissory note, which required Blackhawk to pay back the $700,000 (plus additional charges) in installments.  Additionally, the parties executed a

---

[10] Although the document making these changes was not dated, the Court finds that it was executed after the APA for two reasons.  First, the fact that Thompson Jr. signed the APA as "COO" and not "COO and President," a title he used on other documents, suggests that he was not yet president when the APA was executed.  Second, Vision's website characterized Blackhawk as a wholly-owned subsidiary that had acquired Scallop's assets, which demonstrates that Blackhawk did not cease to be a wholly-owned subsidiary until after Blackhawk acquired Scallop's assets.

[11] Blackhawk's new ownership structure was as follows: Vision (25%), Thompson Sr. (10%), Thompson Jr. (25%), HarveyWeiss LLC (25%), William Bowen (5%), John Uitz (5%), and Ik Pho Hong (5%).  Vision did not receive any compensation for the 75% interest it gave up.

[12] Thompson Sr. testified that he was not involved in the negotiation of the post-APA agreements between Blackhawk and Scallop.  For multiple reasons, including Thompson Sr.'s demeanor at trial and a September 2015 email indicating that Thompson Sr. had marked up a draft of the Forbearance Agreement, the Court does not find this portion of Thompson Sr.'s testimony credible.

new Earnout Note to replace the earnout payment structure set forth in the APA.  Vision was not a party to the Forbearance Agreement.

As with the APA, Blackhawk did not comply with its obligations under the Forbearance Agreement.  In an attempt to resolve the situation, Krohg reached out to Thompson Sr. and Weiss to discuss payment.  Eventually, in October 2016, the parties executed a Settlement Agreement.  As part of the Settlement Agreement, Blackhawk acknowledged that it owed Scallop approximately $670,000 in outstanding principal and accrued interest.  Pursuant to the Settlement Agreement, Blackhawk was required to make a $27,500 upfront payment (consisting of a $5,000 modification fee, $7,500 in legal fees, and $15,000 in accrued and unpaid interest) and to make monthly payments of $88,000 until its debt to Scallop was repaid.  Vision was not a party to the Settlement Agreement.  Blackhawk paid only a portion of what it owed pursuant to this Settlement Agreement.

  **E.**  **Reasons for Blackhawk's Breaches, the Parties' Communications, and the Blackhawk-Vision Relationship**

The witnesses offered numerous explanations as to why Blackhawk was unable to satisfy its obligations to Scallop.  Thompson Jr. and Weiss testified that Blackhawk could not make money post-acquisition because Scallop's products were mediocre and some key component parts were "end of life" (i.e., no longer being manufactured).  Further, Blackhawk was unable to entice any investors to inject much-needed capital into the company, although it had been hopeful that it would have the money needed to pay back Scallop (i.e., approximately $700,000) "raised and ready to go" by the time the APA was executed.

Throughout the life of the business relationship between and among Scallop, Vision, and Blackhawk, Krohg communicated primarily with Thompson Sr. and/or Weiss, regardless of whether he was technically dealing with Blackhawk or Vision.  At no point did Thompson Sr. (or

Weiss) ever tell Krohg not to communicate with Thompson Sr. regarding Blackhawk.[13]  In fact, Krohg testified that he has never spoken with Thompson Jr.  Further, Weiss, at times, blurred the lines between Blackhawk and Vision.  For instance, in an email that Weiss sent to Scallop and its investor, Silver Oak Management, he wrote:

> Your patience with *Vision and Blackhawk* has been very much appreciated and will increase the probability of full and complete payment.
>
> *Collectively, Blackhawk Imaging and Vision Technologies* are about to emerge from a large and protracted business development effort that will begin producing funded Purchase Orders (Revenue) for the first 10 project locations during the period between January 5th and January 12th. . . .
>
> *The Companies* know *they* are late and *they* have a high degree of confidence of success which is why *they* paid the first $27K when we did. . . . (emphasis added).[14]

As to the Blackhawk-Vision relationship, the evidence at trial indicates that: (1) Blackhawk did not pay dividends to its shareholders; (2) Blackhawk and Vision shared office space for roughly five months and, during that period, Blackhawk paid rent but did not sign a separate lease; and (3) Vision paid for health insurance for some of Blackhawk's employees.

## III.   CONCLUSIONS OF LAW

### A.   Legal Standard

"The doctrine of corporate disregard is an equitable tool that authorizes courts, in rare situations, to ignore corporate formalities, where such disregard is necessary to provide a

---

[13] Thompson Sr. testified that Krohg did not reach out very often after the APA was executed, but that, when he did, Thompson Sr. merely passed Krohg's messages along to Weiss and/or Thompson Jr.  As discussed, supra note 12, the Court finds Thompson Sr.'s testimony on this point to be not entirely credible.  Given the role Thompson Sr. seems to have played in negotiating the forbearance agreement, his characterization of himself as merely a go-between or messenger is likely inaccurate.  The Court finds that he was interacting with Krohg, in a substantive capacity, in connection with the Blackhawk-Scallop relationship.

[14] At trial, Weiss maintained that because he was advising both Blackhawk and Vision and they shared customers, it was natural for him to refer to them jointly.

meaningful remedy for injuries and to avoid injustice." Att'y Gen. v. M.C.K., Inc., 736 N.E.2d 373, 380 (Mass. 2000). Here, Massachusetts state law governs the veil-piercing analysis because the underlying claims for breach of contract are governed by Massachusetts law. See Katz v. Spiniello Cos., 244 F. Supp. 3d 237, 253 (D. Mass. 2017).

> In Massachusetts, the standard for piercing the corporate veil is a demanding one. Corporations are presumed to be separate and distinct entities notwithstanding relationships between them. The corporate veil may be pierced only with reluctance and in extreme circumstances when compelled by reasons of equity. There are two scenarios in which the corporate form may be disregarded. The first is when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the inter-corporate relationship. The second is when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting. Courts considering whether to allow the piercing of the corporate veil consider twelve factors:
>
>> (1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation's funds by dominant shareholder; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud.
>
> The factors are not formulaically added together, but rather, are considered in their totality based on the facts presented.

Medici v. Lifespan Corp., 239 F. Supp. 3d 355, 372 (D. Mass. 2017) (citations and internal quotation marks omitted). Further, "while the [C]ourt looks to evidence as to all the twelve enumerated factors, the center of the inquiry is whether either of the two situations calling for disregard of the corporate form are present." Concepts NREC, LLC v. SoftInway, Inc., No. 19-cv-12033, 2021 WL 916259, at *3 (D. Mass. Mar. 10, 2021). "In determining whether one entity exercised 'pervasive control' over another, and whether 'confused intermingling' exists sufficient to disregard the corporate formalities, we focus on the events giving rise to liability."

Scott v. NG U.S. 1, Inc., 881 N.E.2d 1125, 1134 (Mass. 2008). "In this analysis, the [C]ourt is mindful that there is a 'presumption of corporate separateness that must be overcome by clear evidence.'" Concepts NREC, 2021 WL 916259, at *3 (quoting Negron-Torres v. Verizon Commc'ns, Inc., 478 F.3d 19, 27 (1st Cir. 2007)); see also Spaneas v. Travelers Indem. Co., 668 N.E.2d 325, 326 (Mass. 1996) ("Only in rare instances, in order to prevent gross inequity, will a Massachusetts court look beyond the corporate form.").

**B.     Discussion**

  1. The Twelve Factors

The Court begins its analysis by taking stock of the evidence relevant to the twelve factors described above to help determine whether the facts of this case present one of the two scenarios in which the corporate form should be disregarded.

   a. Common Ownership

At the time of the APA, Blackhawk was Vision's wholly-owned subsidiary. After the post-APA changes to Blackhawk's ownership structure, there was significant overlap of ownership, as Thompson Sr., Thompson Jr., Weiss,[15] and Bowen, who collectively owned 65% of Blackhawk, were all Vision shareholders.[16] Further, Vision retained a 25% interest in Blackhawk.

---

[15] Weiss seems to have owned his Blackhawk interest via an LLC. See supra note 11.

[16] Although no witness testified as to whether Uitz, who owned 5% of Blackhawk, owned Vision shares, documents in the record suggest he did. In any event, Uitz's status as a shareholder is immaterial as it is clear, with or without considering Uitz, that there was significant common ownership.

b.  Pervasive Control

Many of the same people were involved with both Vision and Blackhawk, but the two companies operated independently. Although both Thompson Sr. and Thompson Jr. received advice from Weiss, Thompson Sr. ran Vision, which focused on selling cameras to the military, and Thompson Jr. ran Blackhawk, which focused on selling cameras to non-military buyers. That being said, even though he did not exercise control over Blackhawk's day-to-day operations, Thompson Sr. did participate in discussions with Scallop's representatives (primarily, Krohg) regarding Blackhawk's failure to meet its contractual obligations. On balance, the evidence does not suggest pervasive control.

c.  Confused Intermingling of Business Assets

There is evidence in the record cutting both ways. On the one hand, Thompson Sr., Thompson Jr., and Weiss all adamantly testified that Vision did not (and could not) use Scallop's technology or intellectual property and did not profit from them. Additionally, although the companies shared office space for a period of time, Blackhawk did pay its portion of the rent (and eventually moved into its own office space). On the other hand, at least some employees, such as Uitz, were working for both Vision and Blackhawk.[17] Further, Vision paid $50,000 of the $750,000 purchase price in Blackhawk's acquisition of Scallop.

Notably, neither party offered any evidence concerning whether Blackhawk and Vision (1) maintained separate bank accounts, (2) shared equipment, or (3) shared any third-party service providers, such as consultants, contract salespeople, and lawyers, (and, if so, which company paid them).

---

[17] There was no evidence regarding how such employees were compensated.

d.  Thin Capitalization

Vision did not capitalize Blackhawk at all.[18]  According to Thompson Jr., Blackhawk was supposed to obtain a sizable outside investment before the APA was executed, but it was ultimately unable to do so.

e.  Nonobservance of Corporate Formalities

There is limited evidence in the record as to this factor, and it cuts both ways.  As an initial matter, it is undisputed that the companies are distinct legal entities, and that Blackhawk was created as an LLC under Delaware law.  Further, the changes in Blackhawk's structure were documented.  The two companies shared office space, but Blackhawk paid rent.  Also, Vision paid for health insurance for some Blackhawk employees.

Beyond that, there is not much evidence to speak of.  Notably, neither side offered evidence regarding whether Blackhawk and Vision (1) held separate board meetings, (2) maintained separate bank accounts, (3) filed separate tax returns, and/or (4) prepared separate financial statements.

f.  Absence of Corporate Records

Neither party offered evidence regarding Blackhawk and Vision's respective record-keeping practices.

g.  No Payment of Dividends

Blackhawk did not pay dividends to its shareholders.

---

[18] The $50,000 standstill deposit that Vision paid Scallop, which was credited against Blackhawk's purchase price, could arguably be considered capitalization.  In any event, Blackhawk was, at best, thinly capitalized.

        h.        Insolvency at the Time of the Litigated Transaction

Neither party offered any balance sheets or other financial statements into evidence. Against this backdrop, the Court draws the following inferences regarding Blackhawk's financial condition at various points in time. At the time the APA was executed, Blackhawk had no assets or liabilities (and therefore cannot be aptly described as either solvent or insolvent).[19] Upon execution of the APA, Blackhawk acquired assets (i.e., Scallop's assets) and incurred liabilities (i.e., the $700,000 in promissory notes and the minimum of $125,000 in earnout payments) of roughly equal value.[20] By the time the Forbearance Agreement and Settlement Agreement were executed, Blackhawk was likely insolvent.[21]

        i.        Siphoning Away of Corporation's Funds by Dominant Shareholder

By all accounts, Blackhawk had no corporate funds for Vision (or anyone else) to siphon. In any event, neither party offered any evidence regarding what happened to whatever cash Blackhawk did generate.

        j.        Nonfunctioning of Officers and Directors

Nothing in the record suggests that any Blackhawk directors or officers were nonfunctioning.

---

[19] As noted above, except for paying the fee required to create a new LLC in Delaware, Vision did not provide Blackhawk with any capital when it was created.

[20] Because both parties agreed to the deal, which was negotiated at arm's-length, the Court finds that, at least as of that point in time, both parties believed that the assets that Blackhawk was acquiring were equal in value to the liabilities that it was incurring.

[21] Although there was no direct evidence of Blackhawk's net worth, the Court reaches this conclusion based on the fact that Blackhawk had little luck selling Scallop's cameras, did not pay back Scallop, and was unable to obtain outside investment.

              k.        Use of the Corporation for Transactions of the Dominant Shareholders

It is undisputed that Vision created Blackhawk specifically to acquire Scallop's assets. Nevertheless, creating a new company to effect a merger or acquisition is not uncommon, and does not, itself, suggest that the corporate form should be disregarded. With respect to other transactions, neither party offered evidence of Blackhawk transactions with any party other than Scallop.

              l.        Use of the Corporation in Promoting Fraud

Scallop argues that Vision engaged in fraud by intentionally undercapitalizing Blackhawk. Vision denies engaging in any fraud. Although the Court is troubled by Thompson Jr.'s admission that Blackhawk knew that it would not be obtaining the $700,000 investment prior to executing the APA but went through with the deal nonetheless, the evidence, on the whole, does not establish fraud. The Court credits Weiss's testimony that he was hopeful that Blackhawk could turn things around and Thompson Jr.'s testimony that he was working hard to line up customers and sell cameras. Further, the fact that Blackhawk paid Scallop anything—albeit much less than it was required to—undercuts the notion that Vision and/or Blackhawk were defrauding Scallop.

            2.        <u>The Court Will Not Disregard the Corporate Form</u>

As noted earlier, to prevail on its veil-piercing claim, Scallop must convince the Court that, based on an assessment of the twelve factors discussed above, this case fits into one of two scenarios. First, that "there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the inter-corporate relationship." <u>Lothrop v. N. Am. Air Charter, Inc.</u>, 95 F. Supp. 3d 90, 100 (D. Mass. 2015) (quoting <u>My Bread</u>

15

Baking Co. v. Cumberland Farms, Inc., 233 N.E.2d 748, 752 (Mass. 1968)). Or second, that "there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting." Id. at 100 (quoting My Bread Baking, 233 N.E.2d at 752). Moreover, the Court will disregard the corporate form only if it is necessary to prevent "gross inequity," Spaneas, 668 N.E.2d at 326, or "avoid injustice," M.C.K., Inc., 736 N.E.2d at 380.

With respect to the first scenario, there was no pervasive control here. Although Thompson Sr. served as Blackhawk's primary liaison to Scallop, he was not controlling Blackhawk's day-to-day operations. Nor was there any evidence in the record that he, as opposed to Weiss and/or Thompson Jr., was unilaterally making decisions as to how Blackhawk would navigate its relationship with Scallop. Rather, the evidence suggests that, although they may have been aided by Thompson Sr., it was Thompson Jr. and Weiss who were making key decisions for Blackhawk. Further, for the reasons discussed below, there was no fraudulent or injurious consequence stemming from Blackhawk's relationship with Vision.

With respect to the second scenario, it is a closer call. As a starting point, Blackhawk and Vision are engaged in very similar businesses. Although Vision sold MIL-SPEC cameras to the military, and Blackhawk sold ruggedized cameras to non-military purchasers, both companies sold tougher-than-ordinary cameras. And even that line seems somewhat blurred in light of Weiss's testimony that some customers, such as the Los Angeles County Sheriff's Department and the Mexican government, were interested in both Vision and Blackhawk products. Additionally, key personnel, Weiss in particular, did a poor job differentiating the two companies when interacting with third-parties (including Scallop). For instance, Weiss's December 2016

16

email to Krohg and Silver Oak Management suggests strongly that Weiss viewed the companies as interchangeable (or, at the very least, highly connected). Further, the Court finds it noteworthy that, although he was no longer a Blackhawk officer, Thompson Sr. neither requested that Krohg contact someone else at Blackhawk nor clarified that Vision and Blackhawk were distinct companies (that operated separately) when Krohg reached out to him after Blackhawk fell behind on payments. In sum, an outside observer might well be confused as to "the manner and capacity in which [Blackhawk and Vision] and their respective representatives [we]re acting." Lothrop, 95 F. Supp. 3d at 100 (quoting My Bread Baking, 233 N.E.2d at 752). Accordingly, Scallop has arguably adduced evidence sufficient to satisfy the second veil-piercing scenario.

Nevertheless, even assuming that there was a "confused intermingling," the Court will not disregard the corporate form here because doing so is not necessary to prevent "gross inequity" or "injustice." Scallop entered into a series of contracts with Blackhawk and Blackhawk alone. Notably, Scallop was represented by counsel in connection with the APA, as well as the Forbearance Agreement and the Settlement Agreement.[22] Additionally, it had an opportunity to seek disclosures and/or representations and warranties from Blackhawk as to its financial condition but did not do so. Instead, Scallop entered into a contract with a newly-formed entity without ensuring that it was financially viable or obtaining any sort of contractual recourse against Vision, the entity with which it had previously dealt. Because it was represented by counsel and managed by Krohg, an experienced and well-credentialed

---

[22] Krohg testified that Scallop had legal counsel in connection with the APA, and both the Forbearance Agreement and the Settlement Agreement had provisions requiring Blackhawk to pay Scallop's legal fees.

businessman,[23] the Court must assume that Scallop rationally considered the risks associated with proceeding as it did and found them to be tolerable in light of the APA's terms.[24] Against this backdrop, it would not be inequitable or unjust to limit Scallop to the contractual recourse that it bargained for by preventing it from piercing the corporate veil.[25] In sum, Scallop did not bargain for a contractual guaranty from Vision, and the Court declines to grant it one *ex post facto*. See OMV Assocs., L.P. v. Clearway Acquisition, Inc., 976 N.E.2d 185, 194 (Mass. App. Ct. 2012) (reasoning that because allowing the corporate veil to be pierced in a contract action would amount to rewriting the contract to include a guaranty, veil-piercing was inappropriate).

To be sure, Vision and Blackhawk should have done a better job of clearly delineating the boundaries between the two companies. Still, no one from Vision ever told Scallop that it would assume Blackhawk's debts or agree to be contractually bound by Blackhawk's contracts with Scallop. The fact that Krohg communicated with Thompson Sr. and Weiss (as opposed to Thompson Jr. and Weiss) regarding Blackhawk—and may have subjectively believed that Vision would pay Blackhawk's debts—is not enough to overcome the presumption of corporate separateness. At bottom, "the corporate veil may be pierced only with reluctance and in extreme circumstances when compelled by reasons of equity," Lothrop, 95 F. Supp. 3d at 100, and the

---

[23] Krohg has an MBA from Harvard Business School.

[24] Specifically, Scallop's assets likely were not all that attractive, and the deal with Blackhawk was the best deal that could be struck.

[25] Piercing the corporate veil is not, as a matter of law, unavailable in contract cases. Still, "[s]everal courts and commentators have suggested that it should be more difficult to pierce the veil in a contract case than in a tort case." Birbara v. Locke, 99 F.3d 1233, 1238 (1st Cir. 1996). This is mainly because "a contract-based relationship, where the parties are plainly identified and their rights and obligations clearly defined, is less likely to present the sort of rare situation that calls for corporate disregard in order to prevent gross inequity." OMV Assocs., L.P. v. Clearway Acquisition, Inc., 976 N.E.2d 185, 192 (Mass. App. Ct. 2012).

evidence supporting veil-piercing must be "clear," Concepts NREC, 2021 WL 916259, at *3 (quoting Negron-Torres, 478 F.3d at 27).  Here, Scallop has failed to demonstrate with clear evidence that this is one of the extreme circumstances justifying disregarding the corporate form.  Accordingly, its claim against Vision must be dismissed.

### IV. CONCLUSION

For the reasons stated above, judgment in Vision's favor will enter.

**SO ORDERED**

August 12, 2021                                          /s/ Allison D. Burroughs
                                                                    ALLISON D. BURROUGHS
                                                                    U.S. DISTRICT JUDGE